. CHARLES ROLLER, Administrator, Appellee, v. FRANK ROLLER, Appellant.

**GIFTS: Evidence—Insufficiency.** Evidence held insufficient to show
1  that the transfer of a certificate of deposit by a mother to her son was intended as a gift.

**GIFTS: Confidential Relations—Presumption of Fraud.** The act of a
2  mother, in causing a certificate of deposit to be changed from her own name to that of a son who, it is made to appear, occupied a very close and confidential relation with his mother, is *presumptively fraudulent,* and will be sustained only on proof by the son that the transfer was free from all undue influence and fraud.

**Headnote 1:** 28 C. J. p. 679.  **Headnote 2:** 28 C. J. pp. 671, 672.

*Appeal from Story District Court.*—H. E. FRY, Judge.

APRIL 7, 1925.

REHEARING DENIED APRIL 9, 1926.

ACTION in equity by Charles Roller, administrator of the

estate of Catrina Barbara Roller, deceased, to recover from the defendant Frank Roller, son of plaintiff's intestate, the sum of approximately $13,000, which it is alleged the defendant is withholding from the estate. The trial court determined the issues in favor of the administrator, and entered decree for the amount claimed, with interest, to wit: $13,895.80. The defendant appeals.—*Affirmed.*

*John Y. Luke*, for appellant.

*Nichol & Nichol* and *Lee & Garfield*, for appellee.

DE GRAFF, J.—The record in this case is quite voluminous, and considerable evidence introduced upon the trial has little or no direct bearing upon the issues involved.

The facts antedating the controversy may be briefly summarized. Appellee, Charles Roller, was a blacksmith during the early part of his life; and after moving from Philadelphia, where he and decedent were married, he worked in Iowa at his trade at various places, either renting or purchasing a shop, according to his convenience. In 1905, he sold his property, realizing some $2,600, which constituted the savings of himself and wife during the years they had resided in this state. A small portion of this sum represented the proceeds of the wife's interest in two lots which she owned. After arrangements had been made for his wife to stay with his daughter, Mrs. Elizabeth North, who was then living on a farm near Osage, Iowa, he turned over to the wife $900, and went on a visit to Germany, the land of his nativity. Upon his return, the following April, he and his wife went to Fort Dodge, where he worked for wages, and later to Elgin, where he rented a shop. About a year thereafter, they moved to Oscher, Winneshiek County, where appellee purchasd a shop. In the meantime, Frank Roller, appellant, and youngest child of appellee, had been working on the farm for Mrs. North; but, upon the purchase of the shop at Oscher, he went into partnership with his father. In the fall of 1908, a farm was purchased in Allamakee County. Apparently the negotiations for the purchase were carried on by Frank and his

1. GIFTS: evidence: insufficiency.

mother. This farm consisted of 100 acres of rough land, situated on a hillside; and much of the farm was covered with brush. The price paid was $32 per acre. The initial payment of $1,000 was made by the mother, and the title was taken in her name. The balance of the purchase price, $2,200, was adjusted by assuming a mortgage already on the farm. Frank Roller had saved between $700 and $800, which, after paying the first year's interest on the mortgage, he invested in stock, machinery, and feed. The mother and son moved onto the farm in December, 1908. The farmhouse was furnished with the household goods that had been accumulated by the appellee and his wife during their married life. Charles Roller remained about a year at Oscher, when he sold his shop and went to the farm to live. Just what the arrangement was when the appellee came to the farm is in dispute; but it clearly appears that he contributed, in addition to his interest in the household goods, over $1,000 for buildings, machinery, and stock, during the years the family lived on the farm.

The evidence shows that Charles Roller, his wife, and the son Frank invested their entire savings in the farm, and occupied it as their home until the summer of 1919. During this period the parties worked together, the son assuming entire charge of the business that was transacted. The teamwork was done by the son, the mother taking care of the house, and the father doing the chores, helping in the garden, cutting brush, and in the winter working some as a blacksmith. During the last few summers before the family moved to Ames, the daughter, Mrs. North, who had secured a divorce, made her home with the family on the farm. The mother at that time was in poor health, and the daughter devoted much of her time to assisting and caring for her.

Toward the end of the summer of 1919, a contract was made to sell the farm, and signed by the appellant and his mother. The negotiations for the sale of the farm had been carried on by the son. During the eleven years the family had lived on this farm, the mortgage had been reduced to $500. The deed was executed September 27, 1919, at the First National Bank of Waukon. There were present, at this time, the vendees, the president of the bank, O. J. Hager, Frank Roller,

Mrs. Elizabeth North, and the father and mother, Mr. and Mrs. Charles Roller. Mrs. North did not remain long, and left before the business was fully transacted. The deed was written by the bank president. Mrs. Roller signed the instrument, but the husband did not sign until after considerable controversy with respect to his interest in the proceeds. The selling price of the farm was $12,500; and, after the payment of the mortgage, there was a balance of $12,000. Under the arrangements made with the vendees and the bank, a certificate of deposit for $12,000 was executed, without interest until March 1, 1920. The certificate was taken in the name of Mrs. Roller. Within an hour, Mrs. North returned to the bank with her mother, who had the certificate of deposit changed to Frank's name. When the certificate became due, Frank divided the fund and deposited $6,000 thereof in the Peoples Bank in Waukon. The proceeds of the farm have remained on deposit in the two banks ever since. In the fall of 1919, the personal property was sold at a public sale for approximately $4,000, all of which was received and kept by Frank Roller. .

In the spring of 1920, the entire family, including Mrs. North, moved to Ames, where her son was attending college. There Mrs. Roller died intestate, April 15, 1922, at the age of 71 years. She left surviving her the husband and three children. At the time of the trial, the husband, Charles Roller, was 74 years of age, Mrs. North, 51, and Frank, 42 years. William, the second child, was married, and living with his wife and family. Charles Roller was appointed administrator of the estate of the deceased, April 20, 1922, and commenced this action in the following August, to recover the proceeds derived from the sale of the farm, alleging that it was property belonging to the estate of his intestate. The trial court found for the plaintiff, and the appeal is triable *de novo* in this court.

I. The appellant claims that the certificate of deposit was a gift to him by his mother. There is no dispute that the funds were actually transferred to his name in the bank; but the intent of the deceased in making this transfer, as evidenced by her declarations, is not so clear. What she seemed to have in mind was the preservation of the fund for the maintenance of a home for herself and husband in their declining years. Upon the

suggestion of the banker that she have a written stipulation, binding the son Frank to take care of her, she said :

"No, I don't want to do that. Frank has always been a good boy, and I am not afraid to trust him."

The son testified before Judge McCall, on a hearing for discovery of assets, that "she [the decedent] turned it over to me, and wanted me to take care of it, and give her and pa a home;" and again, "Mother told me several times that she wanted me to take care of that money and give them a home." These declarations, when considered in the light of other facts, seem to indicate fairly definitely an intention of creating a trust fund, to be used in purchasing another home. The family had talked many times of buying another home; and while there was no definite agreement to this effect, the evidence is fairly clear that it was understood by all that the proceeds were to be invested in a farm somewhere in central Iowa. Frank had transacted all the business connected with the farm which had been sold, and it was natural that he should be intrusted with the funds for the purchase of a more desirable and a better farm. The evidence shows that the decedent had confidence in her son, and felt certain that the fund would be safe in his hands. His management of the affairs of the family had been successful. On the other hand, she seems to have had very little faith in her husband's ability to handle and manage business matters. This feeling on her part was shared by the children, who, in turn, seemed to have been in the habit of remarking in their mother's presence that their "father could not hold onto money." When we consider the fact that the proceeds of the farm represented the entire savings of the decedent and her husband, and that a gift of the same would have left them entirely destitute in their old age, the deduction we have drawn from the evidence that the son was merely intrusted with the care of the fund is materially strengthened. Without stating the facts in further detail, we conclude that the decedent did not turn over the proceeds of the farm to her son with the intention of making him a gift of the certificate in question, but had in mind the safe-keeping and reinvestment of the money in another farm, which was to be the family

home. This purpose was never consummated, and with her death the trust under which appellant held possession of the funds terminated.

II. We will now view the evidence from another angle. The mere fact that the relation of the parties to the claimed gift is that of parent and child is not sufficient to raise the presumption of undue influence or constructive fraud. *Samson v. Samson,* 67 Iowa 253; *Muir v. Miller,* 72 Iowa 585; *Hester v. Sample,* 95 Iowa 86; *Mallow v. Walker,* 115 Iowa 238; *Chidester v. Turnbull,* 117 Iowa 168. The undisputed evidence, however, clearly shows that the appellant occupied a relation of trust and confidence with the decedent. He had taken care of all the business connected with the farm, and had even negotiated the sale of the farm and signed the contract. After the daughter, Mrs. North, came to live with the Roller family, the children managed everything, even to the small task of purchasing articles for the daily needs of the household. The situation is well summed up in the testimony of Mrs. North, in which she said:

2. GIFTS: confidential relations: presumption of fraud.

"The business I did was trading at the store and ordering the groceries. Even before the farm was sold, mother didn't feel like taking any responsibility,—even buying the groceries. She may have felt able, but she didn't want to. She trusted me and Frank entirely."

We can conceive of no case in which the confidential relation between a parent and her children was closer or more complete. The children were in full control of the mother and her property. These facts, under the weight of judicial authority, are sufficient to raise a presumption of fraud and undue influence, and cast a burden of proving the gift to be the free and voluntary act of the deceased. The evidence goes further, and shows that Mrs. Roller, at the time the farm was sold, was aged, and had been in ill health for a number of years. Her eyesight was failing, and she was suffering from diabetes, a disease which, two years later, caused her death. The funds claimed as a gift from her represented her entire possessions. Under similar facts, we have consistently held that a person

claiming by virtue of a gift must sustain the burden of proving himself free from undue influence and fraud. *Spargur v. Hall,* 62 Iowa 498; *Fitch v. Reiser,* 79 Iowa 34; *Curtis v. Armagast,* 158 Iowa 507; *Hull v. Mitchell,* 181 Iowa 51.

In *Curtis v. Armagast,* supra, the question of undue influence and constructive fraud is fully considered, and the authorities bearing upon the subject collected, and the well considered rule of *Mott v. Mott,* 49 N. J. Eq. 192 (22 Atl. 997), is quoted. The controlling principle is also stated, under similar facts to the instant case, in *Hull v. Mitchell,* supra; but we will not repeat in this opinion.

The burden cast upon the appellant to prove the alleged gift to be the free and voluntary act of the decedent is not sustained by the evidence before us. A careful reading of the record convinces us that the reasonable inferences that may be drawn from the testimony of the witnesses not only failed to support appellant's claim, but rather tend to weaken his position.

We discover no reason for disturbing the finding of the court; and the decree entered, therefore, must be, and is,— *Affirmed.*

FAVILLE, C. J., and STEVENS and VERMILION, JJ., concur.