Louis Humphrey et al., Appellants, v. Rozella Norwood et al., Appellees.

No. 41051.

January 12, 1932.

Tobin, Tobin & Tobin, for appellants.

C. H. E. Boardman, for appellees.

Kindig, J.—George Humphrey died testate November 26, 1929. His wife preceded him in death, but he was survived by the following children, heirs at law, and beneficiaries: Anna Humphrey Shaw, Georgianna Humphrey Lahr, and Louis Humphrey, plaintiffs-appellants, Rozella Norwood, defendant-appel-

lee, and Lizzie Goodell. Rozella Norwood and C. W. Norwood, the defendants-appellees, are wife and husband.

Under the will, dated March 24, 1924, the property owned by George Humphrey, the testator, at his death was to be divided equally among the five children. There were two codicils to the will. The first codicil, dated April 23, 1924, nominated the appellant, Louis Humphrey, as executor under the will, while the second codicil, dated January 22, 1925, in effect cancelled that nomination and named A. M. Goodell and the appellee C. W. Norwood as executors. This will, with the codicils, was filed for probate in the Benton County District Court January 4, 1930, but has not yet been admitted to probate. Delay in probating the will seems to have arisen because of the commencement of the present action by appellants.

On December 30, 1929, the appellants Louis Humphrey and Anna Humphrey Shaw were appointed special administrators. In that capacity they, together with Louis Humphrey, Anna Humphrey Shaw, and Georgianna Humphrey Lahr, as individuals, commenced the present proceedings in equity against the appellees. During the trial, Louis Humphrey, Anna Humphrey Shaw, and Georgianna Humphrey Lahr withdrew as parties to the suit. Consequently the special administrators remained as plaintiffs. Hereafter these special administrators will be referred to as appellants.

Originally the suit was brought on the theory that appellees had in their possession certain property belonging to George Humphrey, deceased, for which they had not accounted. An accounting was asked accordingly. Later, however, the appellants amended the petition on the theory that the properties of George Humphrey, deceased, received and held by appellees, may have been obtained by them through a purported gift or contract. Hence, the amendment alleged that the said decedent was not mentally competent to make a gift or execute a contract. Upon those theories the case was tried, and the district court found for the appellees, and denied appellants the relief demanded. Although appellants claimed, through their pleadings, that appellees had wrongfully received and retained $15,000 of the decedent's property, during the trial it developed that $8,000 only was the amount involved.

I. Appellees admit that on or about June 2, 1926, George

Humphrey, the decedent, then living, gave the appellee Rozella Norwood a check for $8,000. This check was signed by George Humphrey and deposited by Rozella Norwood to her own credit. She has since retained the proceeds thereof. Rozella Norwood, it is to be remembered, is the daughter of George Humphrey.

Mrs. Humphrey and her husband, George Humphrey, now deceased, for many years lived on a farm near Vinton. Sometime in 1912 the father and mother, for a reasonable price, sold the farm to Louis Humphrey, with the hope and understanding that he would retain title thereto, in order that the old home might be kept in the family. As a part of that transaction Louis gave his father a note, secured by a mortgage on the farm, for the amount of $21,000. Apparently the father and mother, after selling the farm, moved to a home in town. The mother died sometime in the fall of 1924. Shortly thereafter, George Humphrey, the father, went into the home of his daughter Anna Humphrey Shaw, at Waterloo. He remained there only a short time, and then went to live in the home of his daughter the appellee Rozella Norwood, at Vinton. Before the mother died it was her desire that after her death her husband, George Humphrey, live with the daughter Rozella Norwood. That daughter resembled her mother very much, and therefore the father considered her his favorite.

Mr. Humphrey had a lovely home with the Norwoods, and he appreciated it very much. On June 2, 1926, George Humphrey divided $15,000 among his five children above named. To each child he gave the sum of $3,000. It appears, however, that at least some of the children were at that time indebted to him, and the amount of such indebtedness in each case was deducted from the $3,000 given. Although $15,000 of George Humphrey's property was thus divided among his five children, he nevertheless received from each child a promissory note for $3,000, bearing five per cent interest, payable annually. Each note, however, according to the agreement of the parties, was to be cancelled upon the death of George Humphrey. Rozella Norwood, the appellee, on the same day received from her father the aforesaid check for $8,000.

Appellees were restricted when testifying because of the statute against the revelation of conversations of persons since deceased. According to the testimony of the appellee C. W.

Norwood, his wife Rozella and George Humphrey had a transaction resulting in the issuance of the $8,000 check. This check was "issued" to the appellee Rozella Norwood, and, as before explained, she deposited it to her own account in the bank, and has since retained the proceeds thereof. Some explanation was furnished by the witnesses concerning the reason why George Humphrey issued this check to Rozella. Old acquaintances of George Humphrey's talked to him on the streets of Vinton and at the Norwood home upon several occasions. Mr. Humphrey told these old friends of his special love and affection for his daughter Rozella Norwood. Likewise he expressed to these friends his appreciation for the home his daughter Rozella was furnishing him. At the same time, George Humphrey indicated that he was going to show his appreciation and furnish some compensation to his daughter Rozella for the home by giving her more of his property than the amounts to be received by the other children.

Margaret Holden testified that during a conversation George Humphrey told her "his whole life history." During this conversation Mr. Humphrey stated to the witness that he had divided his property among his children. Upon this occasion, he also said that Mrs. Norwood "was going to get more than the others." Continuing the conversation, Mr. Humphrey further stated to the witness that Mrs. Norwood was "to get the lion's share."

Joseph Gillespie, another witness, also testified about a conversation which he had upon this subject with George Humphrey. According to this witness, Mr. Humphrey said he had given "his house to the girls, sold the farm to his son Louis, made a distribution of his money, and executed a will." That conversation was after the $8,000 check had been given to Mrs. Norwood.

Several other witnesses testified concerning conversations with George Humphrey during which he stated that, because of the goodness of his daughter Rozella Norwood, she was to receive more of his property than his other children. Manifestly it is evident that George Humphrey, upon the occasion in question, gave his daughter Rozella Norwood the $8,000 check as a gift, and perhaps as compensation for furnishing him a home. George Humphrey lived in that home with his daughter and her

husband for approximately five years. He was contented there, and appreciated the love and kindness of his daughter who so much resembled her mother.

It is true, as claimed by appellants, that these witnesses sometimes said Mr. Humphrey stated ''he was going to give his daughter Rozella Norwood more property than the other children.'' By the use of what appellants claim is the future tense, George Humphrey, they say, expressed the thought that he had not yet given the additional property to his daughter Rozella Norwood. Hence it is argued that the intended gift was never executed. That being true, appellants maintain that the $8,000 received by Rozella Norwood should be returned because the father did not fulfill his intention of giving the same to her. A fair consideration of the entire record, however, constrains us to find that George Humphrey expressed the thought that he had given the $8,000 to his daughter Rozella Norwood. Great care must be taken in considering the statements of oral conversations. At least two witnesses testified that George Humphrey stated Mrs. Norwood was getting more of his property than the other children, and again, that she was receiving ''the lion's share.'' This, together with the fact that the appellee C. W. Norwood testified about a transaction between his wife Rozella and her father whereby the $8,000 check was issued, indicates a conclusion of the matter at that time. When stating what he was going to do with his property, George Humphrey, of course, had in mind his whole scheme of disposing thereof. For instance, he made gifts and executed a will. Although the will was executed, George Humphrey nevertheless gave $3,000 on the occasion named to each of the children. On the same date he gave the appellee Rozella Norwood an additional $8,000 check. Notes were taken for each $3,000 gift, to be cancelled upon his death. No note was taken from Rozella Norwood for the $8,000 gift. So, when George Humphrey was talking to his old friends about ''going to give Mrs. Norwood more than the other children,'' he undoubtedly had in mind his scheme of giving: that is to say, he perhaps considered that the $3,000 gift to each was not completed until his death, because during his lifetime he had the note of each child for the $3,000. Each note bore interest at five per cent per annum. Moreover, the property not disposed of by gifts was to be divided through the will. In other

words, the giving referred to by George Humphrey would not be completed until his death. Thus, when he may have stated to an old friend that he "was going to give Rozella Norwood more than the other children," he undoubtedly had in mind that, when all the giving was completed, she would have more than the rest.

But it is claimed by appellants that after the gift was made, the appellee Rozella Norwood did not list the $8,000 for taxes. Likewise, it is asserted that George Humphrey thereafter reported for taxation moneys and credits to the extent of $18,000. Hence, it is argued that the $8,000, regardless of the alleged gift transaction, must have remained the property of George Humphrey. Manifestly such conclusion is not the necessary result of the appellee Rozella Norwood's failure to list the $8,000 item for taxes. Nor is the fact that George Humphrey listed $18,000 for taxes after the aforesaid gift transaction indicative that the gift was not made. There are several reasons why the appellee Rozella Norwood might not have listed the $8,000 for taxation. Possibly she had debts in sufficient amounts to offset the credit. It may be that she neglected listing the item for taxation. In any event, the circumstance is not sufficient to overcome the record, which persuasively indicates that the gift was made. George Humphrey, on the other hand, when listing moneys and credits to the amount of $18,000, did not necessarily include the $8,000 gift to his daughter Rozella Norwood. He was holding five notes of $3,000 each, executed by his children in the manner and way before explained. The total of those notes would amount to $15,000. According to the record, Mr. Humphrey owned other moneys and credits. When listing such moneys and credits to the extent of $18,000, George Humphrey did not identify or specify the $8,000 contained in the gift. Apparently the $8,000 gift was not reported for taxation by George Humphrey. While the foregoing circumstances, relating to the alleged listing on the one hand and the purported failure to list on the other, must be weighed and given full force and effect, yet they are not sufficient to overcome the other evidence in the record.

Under the entire record, then, it is obvious that George Humphrey gave his daughter, the appellee Rozella Norwood, the $8,000 upon the aforesaid occasion. Perhaps the gift was part-

ly to compensate her for his lovely home, kind care, and affection. Nevertheless, he gave her the money.

II. Appellants contend, however, that the appellees exercised a superiority over the said George Humphrey, and a confidential and trust relationship existed between them. Furthermore, it is urged by appellants that the mentality of George Humphrey was very low because of age and disease. With the existence of that weak mentality, appellants declare that it was comparatively easy for appellees to exercise their superiority over George Humphrey and obtain from him the $8,000 gift. Such gift, appellants argue, was obtained by appellees from George Humphrey because of the confidential and trust relationship and exercise of the aforesaid superiority. Therefore appellants conclude that the gift was obtained by appellees by exercising undue influence over George Humphrey, and because thereof a constructive fraud arose. The burden of proof, then, under those circumstances, to rebut the presumption of fraud, appellants insist, is upon the appellees. On this point they cite McNeer v. Beck, 205 Iowa 196; Burger v. Krall, 211 Iowa 1160; Osborn v. Fry, 202 Iowa 129; Pruitt v. Gause, 193 Iowa 1354; and other cases.

As shown by the foregoing authorities, it unquestionably is true that under certain circumstances the son or daughter who is the grantee in a deed executed by an aged and mentally weak father or mother, or the recipient of a gift made by such parent, does have the burden of proving that the transaction is fair and free from fraud. That general rule, however, has no application to the facts revealed in this record.

"The rule is, of necessity, applied according to the peculiar circumstances of the particular case where the question arises." Osborn v. Fry (202 Iowa 129, local citation 130), supra.

Consequently, before a conclusion can be reached in the case at bar, it is necessary to review the facts revealed by the record.

George Humphrey and the appellee Rozella Norwood, as before explained, were father and daughter. This relationship, however, in and of itself is not sufficient to create a trust or confidential relationship and cast upon the recipient of a gift the burden of disproving undue influence or constructive fraud. Roller v. Roller, 201 Iowa 1077 (local citation 1082); Stonewall

v. Danielson, 204 Iowa 1367 (local citation 1370) ; Albaugh v. Shrope, 197 Iowa 844; Erusha v. Wisnewski, 207 Iowa 1187; O'Neil v. Morrison, 211 Iowa 416.

In addition to the foregoing it appears from the record, as previously suggested, that George Humphrey, during the last five years of his life, lived in the appellees' home. But that fact alone does not create the relationship of confidence and trust.

"The mere fact of residence (of a parent) in the home of (a daughter) * * * is not a basis for a claim of fiduciary relationship." O'Neil v. Morrison, 211 Iowa 416, supra.

Wherefore, it is necessary to search further for evidence indicating confidential and trust relationship. Underlying the doctrine of confidential and trust relationship as applied to this case "is the presence of a dominant influence, under the impulse of which the act is presumed to have been done." That is the essential thing, and the very gist of the doctrine as applied to this record. Albaugh v. Shrope (197 Iowa 844, local citation 849), supra. Here, however, there is absolutely no evidence showing that the appellee Rozella Norwood exercised any dominance of any kind whatever over her father, George Humphrey. Rather than domineering over him, the record indicates that she at all times conducted herself as a loving and dutiful daughter, who was doing her utmost to provide for her father a comfortable and happy home. While George Humphrey was living with his daughter, appellants visited him on many occasions. George Humphrey, without molestation, invited friends and relatives into the Norwood home. Also friends, neighbors, and children visited the old gentleman when he was walking about the town of Vinton. The element of dominance, therefore, is not present.

Also there is no evidence indicating that this daughter advised her father concerning his business affairs or in any way influenced him in reference thereto. It is claimed, however, by appellants that the domineering over George Humphrey was exercised by the appellee C. W. Norwood, the husband of the appellee Rozella Norwood. On March 2, 1925, George Humphrey gave to the appellee C. W. Norwood and A. M. Goodell a power of attorney "to look after, care for, and manage" the former's business. Obviously the purpose of this power of attorney was to force the collection of the amount due George Humphrey on

the aforesaid mortgage executed by his son Louis Humphrey. This mortgage was given by Louis Humphrey to his father to secure part of the purchase price of the above-named farm. Upon receiving the power of attorney, C. W. Norwood and A. M. Goodell compelled Louis Humphrey to pay the remainder of approximately $17,000 due on the mortgage. After receiving the proceeds of that mortgage, George Humphrey, the father, as before explained, divided $15,000 of the money among his five children, by giving each $3,000 thereof. So far as shown by the record, however, C. W. Norwood and A. M. Goodell performed no other duties under the power of attorney. At all events, neither C. W. Norwood nor A. M. Goodell had anything to do with inducing George Humphrey to give the appellee Rozella Norwood the said $8,000. She herself received the gift and made the deposit thereof to her own credit. According to the testimony, the appellee C. W. Norwood took no part in the transaction.

Consequently there is nothing to show that the gift to the appellee Rozella Norwood was obtained by dominance over George Humphrey. Neither does it appear that there was any relationship of confidence or trust between George Humphrey and the appellee Rozella Norwood. Likewise, as before explained, there is no evidence offered to indicate that the appellee C. W. Norwood had anything whatever to do with the gift transaction.

More than that, the appellants have failed to prove that George Humphrey, when he made the gift to the appellee Rozella Norwood, on June 2, 1926, was mentally incompetent or of such inferior mentality as to enable another to domineer over him. Having failed, then, to show the relationship of trust and confidence between George Humphrey and his daughter Rozella Norwood and the exercise of dominance by her over him, the burden is not upon appellees "to rebut the presumption that the 'gift' transaction was fraudulent and voidable." See cases above cited. Appellants have failed to show that the transaction was not in good faith. They have proven no fraud, and have neither alleged nor proven undue influence. Under those circumstances, the district court properly refused to set aside the gift.

III. Although the burden of proof above discussed was not upon appellees, appellants argue nevertheless that George

Humphrey, when making the alleged gift, was incompetent and of unsound mind. Therefore, they conclude that he was not capable of making a valid gift or executing an enforceable contract. Again appellants have failed to carry the necessary burden of proof.

Several witnesses testified for appellants concerning the mental condition of George Humphrey. When making the gift to the appellee Rozella Norwood, Mr. Humphrey was 75 years old. Sometimes during the later years of his life, he wept when thinking of his deceased wife. That surely is no indication of insanity. The old gentleman had arteriosclerosis. How far the malady had developed does not appear. Many men who have arteriosclerosis are competent to make gifts and contracts. Furthermore, it is said that upon an occasion Mr. Humphrey did not recognize one or two of his grandchildren. This incident in itself does not necessarily indicate weak mentality. Other witnesses testifying for appellants stated that George Humphrey steadily failed after his wife died, that he was forgetful, and that his mind "was bad." Just when these conditions existed in reference to June 2, 1926, when the gift was made to Rozella Norwood, does not appear. Nor is it indicated what the witnesses meant by saying that George Humphrey's mind was bad. There is nothing to indicate the degree of "badness." These witnesses called by appellants made other statements in reference to the mental condition of George Humphrey, but there is nothing in this testimony which suggests that on the occasion in question he was not capable of making the gift. Moreover, on the day Mr. Humphrey gave the appellee Rozella Norwood the $8,000, he gave each of the appellants $3,000. If he was mentally competent to make one gift, he was likewise capable of making the other. At or about the same time, George Humphrey divided among his children, including the appellants, an interest in his deceased wife's estate. So, too, on that occasion he deeded them a farm. Other transactions were had between appellants and George Humphrey about the same time. Appellants, then, on those instances must have considered their father competent to transact business. Not only that, but many old friends of George Humphrey's testified for appellees concerning his mentality. Those witnesses include John Sellers, Ralph H. Niemeier, G. R. Holden, Mrs. Odille Howard Jameson, and Joseph

Gillespie. Each of those witnesses was disinterested, and all of them emphatically stated that George Humphrey's mind was sound. It was with these last-named witnesses that Mr. Humphrey discussed the disposition of his property and the making of gifts,etc. The range of conversation between these witnesses and George Humphrey was rather broad. Many subjects were discussed. Everything indicates mental soundness. A preponderance of the evidence is in favor of soundness rather than unsoundness of mind. Consequently the district court did not err in failing to set aside the gift on the theory that George Humphrey did not have mental capacity to make it.

Wherefore, the judgment and decree of the district court should be, and hereby is,—Affirmed.

WAGNER, C. J., and EVANS, FAVILLE, ALBERT, MORLING, and GRIMM, JJ., concur.